MANSARD JOHNSON *vs.* EDWARD L. HOLMES.

Suffolk.     November 17, 18, 1904. — May 19, 1905.

Present: KNOWLTON, C. J., MORTON, LATHROP, BARKER, HAMMOND, LORING, & BRALEY, JJ.

*Seaman.     Ship.     Negligence.*

In an action by a seaman against the master of a vessel on which he was employed, for alleged aggravation of an injury from having the fingers of his right hand frozen while pounding ice from the rigging, by the defendant's failure to provide proper medical and surgical treatment and keeping him at work after his injury, it appeared, that the vessel was a three masted schooner carrying a cargo of coal from Baltimore to New Bedford in the month of February, and was short handed, having on board only the master, the mate, who had been injured, four seamen and a steward, that she experienced very cold weather, a blizzard and heavy gales, and was in danger during the three days from the time of the plaintiff's injury until the plaintiff turned into his bunk and ceased to work, that the plaintiff's hand, as soon as he returned to the deck after having it frozen, received the proper treatment by being immersed in ice or in cold water until warmth and feeling came back, and thereafter was treated by the application of grated potatoes as a poultice, which was shown to be an ordinary remedy. *Held,* that it was the duty of the defendant to decide what under the

circumstances to do with and for the plaintiff in connection with all the duties resting upon him as master of the vessel, and that there was no evidence which would justify a finding that the defendant's decisions as to what he should do in managing the vessel and in his treatment of the plaintiff were not reasonable and proper at the times and under the circumstances when they were made. *Also,* that it was not material that the defendant did not give the plaintiff oil for his hand when he asked for it, as it was shown that the defendant furnished the ordinary remedies.

TORT, by a seaman against the master of a vessel on which he was employed, for aggravation of an injury received by the plaintiff from having the fingers of his right hand frozen, with originally a first count for the injury itself, which was discontinued as explained in the opinion.    Writ dated October 30, 1893.

The previous course of the case including a decision of this court is described in the opinion.    The second trial was before *Aiken*, J., who reported the case for determination by this court, concluding his report as follows: " At the trial in the Superior Court before me, the jury returned a verdict for the plaintiff which I set aside as not warranted in law; and with the consent of the parties I report the case for the determination of the Supreme Judicial Court.    If the ruling was right, judgment is to be entered for the defendant; otherwise judgment is to be entered for the plaintiff for the sum of $2,250, that being the amount of the verdict of the jury, to which interest is to be added from the sixth day of April, 1903."

The case was argued at the bar in November, 1904, before *Knowlton*, C. J., *Morton, Lathrop, Barker,* & *Loring*, JJ., and afterwards was submitted on briefs to all the justices.

*M. H. Browne, (J. M. Browne* with him,) for the plaintiff.

*F. H. Smith, Jr., (E. P. Carver* with him,) for the defendant.

BARKER, J.    The plaintiff was a seaman on the schooner Nellie W. Craig, chartered by the defendant, who commanded as master upon a voyage from Baltimore to New Bedford in February, 1893.    While the vessel was at anchor off Barnegat, on February 20, 1893, the plaintiff was kept in the rigging pounding off ice, and there froze his right hand.    He sued to recover compensation for the injury, declaring in two counts. He first sought to recover for the injury naturally resulting from the freezing, alleging that the defendant wrongfully and wilfully kept him in the rigging and refused to let him come

down and warm his hands, the defendant knowing well that the plaintiff's hands were freezing, and knowing that he had requested repeatedly to be allowed to come down and warm his hands. The second count sought to recover for an alleged aggravation of the injury to the plaintiff's hand by reason of an alleged neglect to furnish the plaintiff with medical and surgical treatment, wrongfully keeping him on board the vessel without proper care and medical treatment, and compelling him, while so disabled, to perform the duties of a seaman on the vessel.

Upon the first trial of the action the jury found for the defendant on the first count, thus finally removing from the case all questions except that of the defendant's liability for an aggravation of the injury by subsequent negligent or wrongful conduct on the part of the defendant. On the second count the jury returned a verdict for the plaintiff, which was set aside upon the sustaining of the exceptions taken at the trial on the part of the defendant. At the hearing of those exceptions it was not contended that it was the duty of the defendant to have put into some intermediate port, and the question then considered by this court was whether there was evidence that no proper treatment was afforded the plaintiff on the vessel after the hand was frozen. This question was decided adversely to the plaintiff in an opinion which sustained the exceptions. See *Johnson* v. *Holmes*, 173 Mass. 514.

After that decision, the plaintiff discontinued as to his first count and amended his declaration by adding a third count which, like the second, is for the wrongful aggravation of the injury originally suffered by the freezing of the hand, differing only in alleging a neglect to furnish treatment for the alleviation of the plaintiff's pain and suffering as well as for the cure of the frost bite, and also in alleging that the compelling of the plaintiff to work while disabled was unnecessary and without cause.

At the second trial, which was upon these two counts, the jury found a general verdict for the plaintiff. This verdict was set aside by the presiding judge " as not warranted in law," and with the consent of the parties he reported the case for the determination of this court. By the terms of the report thus consented to, if the ruling that the verdict was not warranted in law was right, judgment is to be entered for the defendant;

otherwise, for the plaintiff in a sum stated in the report.  All the material evidence is recited in the report.

As it was the province of the jury to weigh the evidence to find what facts were established by it and to make also reasonable inferences of fact, the question presented by the report is whether upon the evidence the jury reasonably could find any state of facts showing that, after the plaintiff came down from the rigging, his injury was aggravated by any wrongful neglect to give him such care and treatment as could be afforded him on the vessel under the then existing circumstances, or by any wrongful compulsion exercised to make him perform the work of a seaman on board.  In resolving this question, as the verdict was for the plaintiff and as it was not set aside as contrary to the evidence or the weight of the evidence, but as not warranted in law, wherever there was a conflict of evidence the facts reasonably to be inferred from it are to be taken in favor of the plaintiff, and all reasonable inferences of fact are to be drawn in his favor.

The vessel, a three masted schooner laden with coal, left Baltimore for New Bedford on February 9.  That voyage is ordinarily a voyage of six or seven days.  When ten days out, to wit, on Sunday, February 19, at eleven o'clock at night, the wind came out from the N. N. W. and blew a blizzard, very cold.  At 2 A. M. that night the mate was injured.  At 5.30 A. M. (according to the plaintiff), at 6.30 A. M. (according to the mate) and at 7 A. M. (according to the defendant — the captain —), the schooner anchored at Barnegat, a good harbor for a west wind but no harbor at all for an east wind, — just an anchorage on a lee shore in an east wind.

There was a conflict of testimony between the plaintiff and the captain as to the condition of the schooner at Barnegat.

The plaintiff testified " that no sail was blown away," and that " the sails were not iced up."

The captain testified that " they lost the forestaysail, the other staysail blew in ribbons," and " the foresail and mainsail were disabled "; also that " the vessel was so badly iced up that in order to get the sails down they had to go into the rigging and cut the halyards."  The captain's story is that all hands were busy all Monday clearing the vessel from ice, thawing out the

halyards and splicing them again, and that this work was not ended until 4 P. M. on Tuesday, although the vessel was under way on Tuesday, after 10 A. M.; that the halyards, after being cut, had to be put "in the stove oven" and kept there "four or five hours before they could get a temporary rough splicing in order to hoist the sails again." The barometer indicated that an east wind was coming on. The crew seem to have knocked off work at 5 P. M. on Monday, but the captain says "that he was not able to clear up his vessel until four o'clock Tuesday afternoon." It was cold and blew a gale all day Monday, while they were at anchor at Barnegat. On Monday night, at three o'clock, A. M., the weather permitting, the captain began to weigh anchor. He had two anchors down, one weighing thirty-five hundred pounds, with fifty to sixty fathoms of chain, and the other weighing three thousand pounds, with thirty to forty fathoms of chain. They got up the anchors and got under way at 10 A. M. Johnson says 7 A. M.

When they got under way the wind was fair and moderate. "He [the captain] considered his vessel in peril on Tuesday, ever [*sic*, for even] after she got under headway, as the sea was too calm and the easterly wind was striking on it." The captain also testified that "the vessel was sailing along very slowly with a fair wind, with sails iced up and the crew cutting ice out of them to get them ready to set."

What the captain's story means is this: With an east wind the schooner was on a lee shore. When he came to anchor his sails were reefed and all iced up. All Monday, the gale still blowing, all hands were cleaning the vessel from ice and splicing the halyards as described, and did not finish when supper time came at five o'clock. That night the gale passed off with indications that the wind would come in from the east. At three o'clock that night, the weather permitting, he began to get up two large anchors having heavy chains out, — a terrible piece of work without steam. He got the schooner under way at ten o'clock; the plaintiff says seven o'clock. Then he had to shake out the reefs from the frozen sails after getting under way, and get them set; and also he had to set the light sails, the wind being east and too light. In other words, the wind was so light he had to get all sail on her to keep her off the lee shore after

he got his anchors, and he had to get his anchors for he could not stay anchored with the wind coming in east, which made the shore a lee shore.    He says he succeeded in getting the necessary sail on her at four o'clock Tuesday afternoon.    The wind then came in from the southeast, and by eight o'clock was blowing hard, with a blinding snow storm, and we infer that they had to reef her down.    This gale blew that night, the next day, Wednesday, and Wednesday night.    Thursday morning it moderated as they entered Buzzard's Bay, and at eleven o'clock they docked at New Bedford.

The plaintiff says that he turned in to his bunk at midnight Tuesday night, and stayed there until he got out at New Bedford.    This is contradicted by the captain.

Upon the question whether the plaintiff was furnished all available proper treatment for the frostbite, as distinguished from treatment for the alleviation of his pain, the evidence at the second trial seems to have been more favorable to the defendant than that at the first trial.    At both trials it was shown that the only proper initial treatment was the very gradual thawing out of the hand by immersing it in ice or in cold water until warmth and feeling came back.    At both trials the evidence showed that at once on returning to the deck the plaintiff received this treatment.    At both trials it appeared also that thereafter the hand was treated by the application of grated potatoes as a poultice.    At the first trial there was no evidence that this application was beneficial or otherwise.    At the second trial there was uncontradicted evidence· that the application of grated potatoes to frostbites was beneficial and common.    We think that, aside from the questions whether there was aggravation of the plaintiff's injury by wrongfully compelling him to work, and whether all was done that reasonably could be done to alleviate his pain, the jury would not have been justified in finding that there was any actionable neglect to afford him reasonable treatment for the cure of the frostbite.

The only evidence as to the plaintiff's having been compelled to work against his protest was in his being put to shovelling ice on the afternoon of the day on which his hand was frozen, after it had been thawed out, and made to steer the next day. He admitted that " shovelling ice was easier work than hauling

sails and ropes." At this time his hand had been thawed out and was bandaged; "it had not become swollen," and had not begun to crack; "it did not crack Monday." As to his steering on the next day, it took all hands from three o'clock A. M. until 7 A. M., as the plaintiff testified, or until 10 A. M., as the defendant testified, to get the anchors; and after that all hands had to shake out the reefs and clear the sails of ice, to keep the schooner from being caught on a lee shore by the east wind which was predicted by the barometer, and which came as a gale at eight o'clock Tuesday night. The plaintiff testified that he turned into his bunk at midnight on Tuesday night and stayed there until the schooner got into New Bedford. We see nothing here which would warrant a jury in finding that the defendant was negligent in his treatment of the plaintiff.

The defendant was master of the vessel, and as such he alone was charged with the responsibility for its safety and that of its cargo and crew. If conflicting duties called him, he himself in the first instance was the judge of what he ought under the circumstances to do with and for the plaintiff in connection with all the duties resting upon him as master of the vessel. If in the exercise of his honest judgment at the time he felt that his whole duty as master required him to compel the plaintiff to work, and required him to refuse to leave his own post to procure aid for the plaintiff when requested, neither of those acts could be found to be wrongful or negligent on the part of the defendant, unless the evidence sustained the burden which was upon the plaintiff to show that the defendant's decision was not reasonable and proper at the time and under the circumstances. *Danvir* v. *Morse*, 139 Mass. 323, 324.

We think that the evidence reported compels the conclusion that the vessel was in peril from a time before that when she was brought to anchor off Barnegat until the plaintiff turned into his bunk at midnight on Tuesday night, that the defendant so judged, and that whatever he did in compelling the plaintiff to work and in refusing to get him aid was done honestly in accordance with the defendant's judgment of his whole duty as master under the then existing circumstances. We think further that the evidence would not justify a finding that this decision of the master was not reasonable and proper under the

circumstances.   Owing to an injury to the mate, the whole force of men aboard, consisting of the captain, the mate, four seamen and the steward, the vessel was short handed.   In the north-westerly gale which compelled her to anchor off Barnegat she had become iced up.   Her position at anchor near the shore made it necessary that she speedily should be freed from ice and got under way and farther off shore before the wind should come from the east as the barometer indicated that it would come, and as it shortly did.   The only possible cause to doubt the reasonableness or propriety of the defendant's decision as to what he ought to do for or with the plaintiff is the testimony of the latter that " he didn't see the captain doing anything in the meantime [i. e. on Monday afternoon] except walking around backwards and forwards."   This is not enough to contradict the captain's story as to the condition of things and as to what he, the captain, was doing, namely, that " he [Holmes] was busily engaged in pounding ice and helping to splice the halyards; that the halyards were iced up, and they had to take them and put them in the stove oven and keep them there four or five hours before they could get a temporary rough splicing in order to hoist the sails again."   The. plaintiff may not have seen this work by the captain and yet he might have been at it.

We do not think it material that the captain did not give the plaintiff oil when he asked for it.   The captain was not negligent if he furnished one of the ordinary remedies, and it was proved that a potato bandage is an ordinary remedy, and that was furnished on Monday at five o'clock.

In the opinion of a majority of the court there should be

*Judgment for the defendant.*